Gregory (Jodi) Jeloudov

2301 NE Savannah Rd, #1032

Jensen Beach, FL, 34957

Telephone: (772) 301 3773

Facsimile: (321) 326 9116

Plaintiff in Pro Per

FILED BY _____ D.C.

JUN 16 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| GREGORY JODI JELOUDOV | ) Case Number: |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) **COMPLAINT FOR DAMAGES** |
| vs. | ) **AND DEMAND FOR JURY TRIAL** |
| | ) |
| Sheriff WILLIAM D. SNYDER as | ) Presiding Judge: |
| SHERIFF OF MARTIN COUNTY, | ) Date: |
| FLORIDA, Deputy CORY GITLIN, | ) Time: |
| Supervisor Kevin KRYZDA, Deputy | ) Case filed: June 16, 2021 |
| CASTORO individually and IN THEIR | ) Documents included: |
| OFFICIAL CAPACITY; MARTIN | ) Exhibits 1 through 6 |
| COUNTY, Florida and Daniel J. | ) |
| BONGINO, an individual, | ) |
| | ) |
| Defendant(s). | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**                              Page **1** of **42**

*Jeloudov v. SNYDER, Bongino, et al.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## GENERAL ALLEGATIONS AND PARTIES

COMES NOW the Plaintiff Gregory JODI Jeloudov, because, especially nowadays, the stakes are too high for her and the American LGBTQ+ community, and brings this action for money damages and declaratory relief pursuant to 42 U.S.C. §§ 1983 and 1988, the First Amendment, the Fourth Amendment, the Fourteenth Amendment, and § 5 of the Fourteenth Amendment to the United States Constitution against the the DEFENDANTS WILLIAM D. SNYDER, Deputy CORY GITLIN, Supervisor Kevin KRYZDA, Deputy CASTORO, IN THEIR OFFICIAL CAPACITY AS THE SHERIFFs OF MARTIN COUNTY, FLORIDA; MARTIN COUNTY, Florida and Daniel J. BONGINO, an individual, acting as law enforcement officer, and, in support thereof, alleges as follows:

1) At all material times, all Defendants were acting in their official capacity as Sheriffs of Martin County Florida. At all times relevant herein, the conduct of the Defendants was subject to the United States Constitution, Section 242 of Title 18 and 42 U.S.C. § 1983. Each of the acts of the Defendants alleged in this Complaint were performed under color of law.

2) Plaintiff is a registered disabled veteran of the US Military, an immigrant, who has English as her second language, is a resident of Martin County, Florida and is otherwise *sui juris*.

3) DEFENDANTS Sheriff SNYDER is the active head of the Martin County Sheriff's Office, and as such was responsible for the actions of all servants, agents, employees, and sheriffs of the Sheriff's Office, including KRYZDA. Sheriff SNYDER was responsible for the policies, procedures, training, supervision, and discipline of the officers of the Sheriff's Office.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **2** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

4) Sheriff SNYDER has done nothing to start or implement any policies to prevent non-discrimination and retaliation against the disabled, military veteran and transgender citizens of Martin County, and, instead engaged in discrimination and harassment of PLAINTIFF and of vulnerable and an increasingly demonized community.

5) DEFENDANTS directed their acts by grounding them in religious bigotry. Sheriff SNYDER boasted about his membership in various exclusively-Christian organizations, such as *The Christian Coalition of Florida*, etc. in the *Florida Sheriff Magazine* in January 2021 and in his Twitter posts for Easter and Christmas, quoting the New Testament verses, thus showing his open and wanton hatred, bias and prejudice (page 19) against non-Christians, thus establishing his misconduct *prima facie*:



(Tweet Dated 12/5/2018)

8

ill4


x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

x

Case 2:21-cv-14248-AMC   Document 1   Entered on FLSD Docket 06/16/2021   Page 4 of 64

## FLORIDA ⭐ SHERIFFS



### MANATEE COUNTY
### Sheriff Charles R. Wells (R)

*Education* AS degree, criminal justice, Columbia Southern University *Career* Florida Highway Patrol, 21 years; Manatee County Sheriff's Office, five years; Chief of Police at Palmetto Police Department, five years; elected Sheriff of Manatee County, 2016 and re-elected in 2020 *Honors and Affiliations* Manatee County Law Enforcement Officer of the Year, 1991; Manatee Whitey Knutsen Award, 1991; Unidos Now Visionary 2012; Manatee County NAACP Humanitarian Award, Igar H. Price, Jr. Humanitarian Award, 2016; executive Manatee County Police Athletic League (PAL); chairperson Manatee County Law Enforcement Council; board member, Sheriffs Youth Ranches; board member, North Manatee board member, Law Enforcement Advisory Board for Manatee Technical College; board member, Replay Advisory and Strength in Action; past service to the Boys Scouts of America; Keep Manatee Beautiful, Manatee Substance Abuse Prevention Coalition and North Manatee Storm Football.

**SHERIFF'S OFFICE**
..................600 301 Blvd. W., #202, Bradenton, 34205
..................................................... (941) 747-3011, x 2222
..................................................... www.manateesheriff.com

**COUNTY DETAILS**
....................................................................... Bradenton
................................................................................384,213
*Website* ...........................................www.mymanatee.org



### MARION COUNTY
### Sheriff Billy Woods (R)

*Education* Ocala Christian Academy; Bob Jones University, 1986-1989; B.S. Degree, Criminal Justice Administration/Business Management, Columbia Southern University, Class President of the Leadership of Ocala/Marion Class XXVII *Career* City of Ocala Police Department, 26 years; elected Sheriff of Marion County, 2016 and re-elected in 2020 *Honors and Affiliations* Ocala Police Department awarded Medal of Valor, Medal of Honor, four Distinguished Group Awards; Certificate of Commendation from the American Legion; board member, Salvation Army; Ocala/Marion Chamber & Economic Partnership; Center for Child Protection; Florida Sheriff's Asso-

ciation, District 3, Chair for Marion Senior Services and Sheriffs Ranches Enterprises.

**SHERIFF'S OFFICE**
*Address* ...........................P.O. Box 1987, Ocala, 34478-1987
*Phone* ...............................................................(352) 732-8181
*Website* ................................................... www.marionso.com

**COUNTY DETAILS**
*County Seat* ................................................................... Ocala
*Population* ...............................................................359,777
*County Website* .........................www.marioncountyfl.org/



### MARTIN COUNTY
### Sheriff William Snyder (R)

*Education* Bachelor's degree, criminal justice, Florida Gulf Coast University (1,000 hours advanced law enforcement training); FBI National Academy, University of Virginia; Harvard Kennedy School - Senior Executives in State and Local Government; approximately 40 years law enforcement experience *Career* Miami-Dade Police Department, 20 years; elected to the Florida House of Representatives, served as chairman of Judiciary Committee, 2006-2012; member, Appropriations Committee; member, House Leadership Team; focused on public safety issues, passed nine law enforcement bills including: 1) rewrite of Florida's gang law, 2) rewrite of Florida's human trafficking statutes, 3) rewrite of Florida's background screening law, 4) revamping of Florida's DNA law; Elected Sheriff of Martin County, 2012; re-elected, 2016 and 2020 *Honors and Affiliations* Florida Sheriffs Association Legislative Champion Award, 2012; Florida Sheriffs Association Leadership Award, 2011; John and Reve Walsh Missing Children's Day Award, 2011; Legislator of the Year Award, Florida Police Chiefs Association, 2010; "Katie's Hero" recognition in reference to DNA legislation, John Walsh/America's Most Wanted; Outstanding Leadership Award, Florida Gang Investigators Association; Outstanding Legislator of the Year Award, Florida Council Against Sexual Violence; Superior Performance recognition, Florida Department of Law Enforcement; Lawrence E. Hoffman Legislative Champion Award, Florida Police Benevolent Association; Friend of Free Enterprise Award, Associated Builders and Contractors; Special Recognition, Florida Family Policy Council; Special Recognition for work on behalf of children and families, New Horizons; Brass Ring Award, Boy Scout Gulfstream Council; Faith and Family Award, Christian Coalition of Florida; Recognition for work on behalf of children, Big Brothers/Big Sisters of Martin County; current chair, Criminal Justice Committee/Statewide Council on Human Trafficking; served on Human Trafficking Coalition; served on Violent Crime Counsel; currently serving on Criminal Punishment Code Task Force.

SHERIFF'S STAR ⅄ 2021 GUIDE TO GOVERNMENT

2

222222222222222222222222222222

**COMPLAINT AND DEMAND FOR JURY TRIAL**
*Jeloudov v. SNYDER, Bongino, et al.*

Page **4** of **42**



6) DEFENDANT WILLIAM SNYDER, as SHERIFF of MARTIN COUNTY, Florida, is the Sheriff of MARTIN County, Florida, as organized and existing under the Constitution and laws of the State of Florida to serve and protect all citizens, regardless of their religion, disability, gender identity and any other identifiable criteria.

7) DEFENDANT MARTIN COUNTY supervises and writes its policies, including those of Sheriff's Departments. Martin County is a municipality of

the State of Florida, that has publicly expressed its opposition to LGBTQ+ month and allowed open hatred towards LGBTQ+ community recently:

---

4                    Hometown News - **MARTIN COUNTY** - www.HometownNewsTC.com                    Friday, Oct. 30, 2

## LGBTQ+
From page 1

a diversity, equity and inclusion resolution crafted by District 1 Board Member Christia Li Roberts, which District 5 Board Member Michael DiTerlizzi opposed due to financial concerns.

Right before making her motion, Board Member Defenthaler expressed frustration that the Board majority appeared to have changed its minds after hearing the opposition that evening.

"I was ready and planning to thank Ms. Powers, Mr. Anderson and Ms. Roberts for their support of the proclamation because that's what it looked like Oct. 6," she said. "I

will say it appears to be intentional that the resolution came on the agenda before my proclamation. As a School District, we should be leaders in promoting and understanding acceptance, diversity and inclusion and put our personal views aside."

Ms. Defenthaler, who attended the meeting virtually, also said she felt someone in the community had intentionally "rallied a number of people to come to the Board meeting to talk in opposition" that evening. Many local church pastors did indeed come to the podium to object, including Dr. Darrell Orman, the pastor of Stuart's First Baptist Church. Dr. Orman cited the Indian River County School Board's recent reject of a similar proclamation and the Lee County School Board's decision to rescind its proclamation. The Okeechobee County School Board pulled a similar proclamation from its agenda Oct. 13.

"Our national public education system for 200 years has been designed to teach empirical knowledge, reading, writing, arithmetic, science, history, etc. to equip our students to be successful in life," he said. "I'm against continuing to turn our schools into failed social experiments by pressuring our teachers to create eco-warriors, diversity champions, racially social healers, sexual advocates or anything else. Let the students be students to learn, and let the teachers teach."

Revive Church Pastor Todd Mozingo took a different tack, expressing concern that such a proclamation could open the door for many other groups to request similar treatment for their perceived oppression.

"The proclamation actually says we want to recognize the immeasurable contributions of the LGBTQ+ Americans," he said.

"My question is, what is the correlation between a society contribution and who you love and have sex with? It makes no sense to recognize someone because of who they choose to love or sleep with."

His wife, Jan Mozingo, insisted it was both a parent's responsibility and the School Board's to teach children respect but not the latter's to teach sexuality without permission.

"I believe respect starts in the home," she said. "It's fine to teach it at school as well, but it's a parent's job to teach this [LGBTQ+] in their home."

She also worried the School Board would open a Pandora's Box since few people understand all that's represented by the plus sign at the end of the acronym.

"It's my understanding the new term is LGGBDTTTIQQAAPP," she said. "They [our students] don't need a teacher that may have a totally different persuasion teaching their children, opening up conversations about things like polygamy. What are you going to do about pedophilia, beastiality? How far is it going to go?"

Martin County resident Robert McCurry agreed.

"It is not the job of Martin County schools to educate the vast majority who are not LGBTQ other than teaching them to stop bullying," he said. "Sexual preference does not address other groups dealing with social issues such as obesity, social awkwardness, lack of intelligence, special needs, Muslims, Christians, Jews – all of these groups get bullied – which also makes them at times feel like victims. All these groups deserve respect, but it is not the job of Martin County schools to provide explicit detailed educational programs."

Pastor Lynn Baretta, the founder o Catch the Wave of Hope anti-human ficking organization, opposed for sir reasons, holding up and comparing co of both the resolution that was ultim approved that evening with the procl tion that was rejected.

"In my right hand, I have the resolu It's an excellent, comprehensive, educati approach to end bullying and to encou diversity and equity," she said. "In my hand, I have the proclamation from LGBTQ that is another approach to bull that gives one group an entire month to gram in Martin County. This is very u to all the groups that are being bullied. is not diversity. This is giving one g preference, and it's certainly not equity"

A handful of residents did speak o favor of approving October as LGBTQ tory Month, the first being Corrine D who admitted to being both a minori life and the School Board lobby that ning.

"Thank you for taking the necessary forward for ensuring the Martin Co School District is a district that suppor of the students, no matter their race, inc level, gender or sexuality," she said. proclamation proposed is a step forwa the right direction. If this allows even student to have a more positive experi in school, then I would say it has serve purpose 10-fold."

Andrea Greenlee, the director of Sc Based Services for Tykes & Teens, curred.

"We want to remind these and all dents that we are here to support them

See LGBTQ, page 7





See Your Lamps in a Whole New Light

LAMP CONNECTION
Best Selection of Lampshades In Florida

$10 OFF EACH SHADE!
$39 and up with this HTN Ad

CEDAR POINTE PLAZA
2461 SE OCEAN BLVD., STUART
772-221-0222
www.shadesandlamps.com
SHADES    LAMPS    LAMP REPAIRS

## Texstyleroofs is Revolutionizing Your Outdoor Lifestyle

It all started in 2003 in the Netherlands, Texstyleroofs revolutionized the traditional roofing market from bricks, steel and shade sails, combined into a niche market of the most stylish lightweight but yet highly strong textile roofing solution. This technology is based on proven technologies used in the worldwide stadium roofing market. Covering very large areas with extremely strong and lightweight material, but yet completely

special building needs. With Florida being acknowledged as the sunshine state, outdoor living is a big part of the daily lifestyle. From the beaches, the hospitality business to your backyard. The current trend is to extend ambiance of the indoors to the outdoors. A Texstyleroof will allow your outdoor area to be used throughout the year, while extending your personal ambiance.

In their unique design what is in that currently on the niche in Texstyleroofs

stylish roofing solution, that explicits the indoor ambiance, and comfort yet remaining also extremely suitable for all weather conditions including being hurricane tolerant. A Texstyleroof is always tailored to each customer situation, not only in terms of size but also blends in with your environment and personal style. Each design requires 3D engineering, proper aerodynamics and tailored style and functionality, specifically modeled to your

location to discuss our tailored designs with a perfect customization to your needs and constructional requirements. The designs will be further tailored at the table, so you actually are the architect of your own Texstyleroof. Once agreement of the design, the engineering process starts.

At the manufacturing facility your design is engineered to construct each and every mounting point in the exact measurement and size. Even the poles, made adjustable in your



It is a shade sail but an actual roof

to start the manufacturing process of    customer specific membrane. Onc

---

4     Hometown News - **MARTIN COUNTY** - www.HometownNewsTC.com     Friday, Oct. 30, 2020

## LGBTQ+

From page 1

a diversity, equity and inclusion resolution crafted by District 1 Board Member Christia Li Roberts, which District 5 Board Member Michael DiTerlizzi opposed due to financial concerns.

Right before making her motion, Board Member Defenthaler expressed frustration that the Board majority appeared to have changed its minds after hearing the opposition that evening.

"I was ready and planning to thank Ms. Powers, Mr. Anderson and Ms. Roberts for their support of the proclamation because that's what it looked like Oct. 6," she said. "I



will say it appears to be intentional that the resolution came on the agenda before my proclamation. As a School District, we should be leaders in promoting and understanding acceptance, diversity and inclusion and put our personal views aside."

Ms. Defenthaler, who attended the meeting virtually, also said she felt someone in the community had intentionally "rallied a number of people to come to the Board meeting to talk in opposition" that evening. Many local church pastors did indeed come to the podium to object, including Dr. Darrell Orman, the pastor of Stuart's First Baptist Church. Dr. Orman cited the Indian River County School Board's recent reject of a similar proclamation and the Lee County School Board's decision to rescind its proclamation. The Okeechobee County School Board pulled a similar proclamation from its agenda Oct. 13.

"Our national public education system for 200 years has been designed to teach empirical knowledge, reading, writing, arithmetic, science, history, etc. to equip our students to be successful in life," he said. "I'm against continuing to turn our schools into failed social experiments by pressuring our teachers to create eco-warriors, diversity champions, racially social healers, sexual advocates or anything else. Let the students be students to learn, and let the teachers teach."

Revive Church Pastor Todd Mozingo took a different tack, expressing concern that such a proclamation could open the door for many other groups to request similar treatment for their perceived oppression.

"The proclamation actually says we want to recognize the immeasurable contributions of the LGBTQ+ Americans," he said.

"My question is, what is the correlation between a society contribution and who you love and have sex with? It makes no sense to recognize someone because of who they choose to love or sleep with."

His wife, Jan Mozingo, insisted it was both a parent's responsibility and the School Board's to teach children respect but not the latter's to teach sexuality without permission.

"I believe respect starts in the home," she said. "It's fine to teach it at school as well, but it's a parent's job to teach this [LGBTQ+] in their home."

She also worried the School Board would open a Pandora's Box since few people understand all that's represented by the plus sign at the end of the acronym.

"It's my understanding the new term is LGGBDTTTIIQQAAPP," she said. "They [our students] don't need a teacher that may have a totally different persuasion teaching their children, opening up conversations about things like polygamy. What are you going to do about pedophilia, beastiality? How far is it going to go?"

Martin County resident Robert McCurry said:

"It is not the job of Martin County schools to educate the vast majority who are not LGBTQ other than teaching them to stop bullying," he said. "Sexual preference does not address other groups dealing with social issues such as obesity, social awkwardness, lack of intelligence, special needs, Muslims, Christians, Jews – all of these groups get bullied – which also makes them at times feel like victims. All these groups deserve respect, but it is not the job of Martin County schools to provide explicit detailed educational programs."

Pastor Lynn Baretta, the founder of the Catch the Wave of Hope anti-human trafficking organization, opposed for similar reasons, holding up and comparing copies of both the resolution that was ultimately approved that evening with the proclamation that was rejected.

"In my right hand, I have the resolution: It's an excellent, comprehensive, educational approach to end bullying and to encourage diversity and equity," she said. "In my left hand, I have the proclamation from the LGBTQ that is another approach to bullying that gives one group an entire month to promote themselves. This is very unfair to all the groups that are being bullied. This is not diversity: This is giving one group preference, and it's certainly not equity."

A handful of residents did speak out in favor of approving October as LGBTQ History Month, the first being Corinne Davis, who admitted to being both a minority in life and the School Board lobby that evening.

"Thank you for taking the necessary steps forward for ensuring the Martin County School District is a district that supports all of the students, no matter their race, income level, gender or sexuality," she said. "The proclamation proposed is a step forward in the right direction. If this allows even one student to have a more positive experience in school, then I would say it has served its purpose 10-fold."

Andrea Greenlee, the director of School Based Services for Tykes & Teens, concurred.

"We want to remind these and all students that we are here to support them and

See LGBTQ+, page 7

**See Your Lamps in a Whole New Light**

LAMP CONNECTION
Best Selection of Lampshades in Florida

**$10 OFF EACH SHADE**
$39 and up with this HTN Ad

CEDAR POINTE PLAZA
2461 SE OCEAN BLVD., STUART
**772-221-0222**
www.shadesandlamps.com

SHADES   LAMPS   LAMP REPAIRS

**Texstyleroofs is Revolutionizing Your Outdoor Lifestyle**

8) Municipalities and other local government entities are subject to liability under 42 USC § 1983 and may be sued directly for relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

9) Martin County Florida is a DEFENDANT here and shares municipal liability with the Martin County Sheriff's Office for the tortious conduct outlined herein under 42 U.S.C. § 1983 and other laws under the US Constitution, because they have failed to train and supervise their police.

**COMPLAINT AND DEMAND FOR JURY TRIAL**    
*Jeloudov v. SNYDER, Bongino, et al.*

10)     At all relevant times referred to herein, DEFENDANT Cory Gitlin [hereinafter DEFENDANT Gitlin] and Supervisor Kevin J. KRYZDA were acting under the color of law as deputy Sheriffs for WILLIAM SNYDER, as SHERIFF of MARTIN COUNTY, Florida, and in such capacity, as an agent, servant, and employee of WILLIAM SNYDER, as SHERIFF of MARTIN COUNTY, Florida.

11)     At all times referred to herein, DEFENDANT Castoro and Supervisor Kevin KRYZDA [hereinafter DEFENDANTs Castoro and KRYZDA] were acting under color of law as deputy sheriffs for WILLIAM SNYDER, as SHERIFF of MARTIN COUNTY, Florida, and in such capacity, as an agent, servant, and employee of WILLIAM SNYDER, as SHERIFF of MARTIN COUNTY, Florida.

12)     The discrimination and harassment by the DEFENDANTS have started and then intensified simply because PLAINTIFF is a disabled US Military veteran and a transgender woman. Deputies Gitlin and Castoro *(Badge No. 1947)* acted with the approval and consent of the Sheriff's Office and directly by Sheriff SNYDER, both before and after the incidents described herein.

13)     Under the Florida Section 768.28, *"an action against the State of Florida is the exclusive remedy, when the injury is caused by a state employee, except when the employee acts outside the course and scope of employment or otherwise acts in bad faith, with malicious purpose and in a manner exhibiting wanton and willful disregard of human rights, safety and property of others"*.

14)    The actions described in this Complaint are a clear example of such reckless disregard, discrimination, harassment and abuse.

15)    Martin County Sheriff's Office personnel have agreed to be bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department's of Justice *"Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity,"* dated December 2014 and Executive Order 13,166: "Improving Access to Services for Persons with Limited English Proficiency," (Aug. 2000), *Title VII of the Civil Rights Act of 1964, as amended, 42. U.S.C. 2000 et seq.,* which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving federal financial assistance, Section 504 of the Rehabilitation Act of 1973, which also prohibits discrimination based on disability and requires the Martin County Sheriff's Office to provide effective communication to individuals with disabilities (Exh. 3)

16)    Furthermore, under Title II of the Americans with Disabilities Act of 1990, which prohibits discrimination based on disability and requires the Martin County Sheriff's Office to provide effective communication to individuals with disabilities, particularly disabled veterans and immigrants, such as PLAINTIFF.

17)    The policies underlying *U.S.C. Section 242 of Title 18 and the Civil Rights Act- 42 U.S.C. § 1983,* which the DEFENDANTS have repeatedly violated, include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **9** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

18)     DEFENDANT SNYDER, as SHERIFF of MARTIN COUNTY, Florida, acted through his agents, employees, and servants, including L.M. Richardson, DEFENDANTs KRYZDA, Gitlin and Castoro. DEFENDANT SNYDER in his official capacity will also be referred to as the Martin County Sheriff's Office.

19)     The Equal Protection Clause of the Fourteenth Amendment protects the right of all to be free from arbitrary, irrational, and pretextual enforcement of the law, such as described in this Complaint.

20)     The State of Florida lawfully and permanently following established procedures, after producing the necessary documents, issued PLAINTIFF an official ID with gender Maker **"Female"** in July of 2015.

21)     By way of background, on or about August 19, 2015, PLAINTIFF was attacked by man shouting homophobic and transphobic obscenities at her outside the nail salon on US 1.

22)     DEFENDANTS SNYDER refused to assist PLAINTIFF when she called them, telling her to call the Stuart police and left PLAINTIFF on her own without calling for medical assistance or even Stuart police.

23)     On or about July 10, 2016, PLAINTIFF was verbally and then physically attacked by several neighbors and their visitors, who screamed homophobic, anti-Semitic and transphobic abuse at her.

24)     When PLAINTIFF arrived later at the Martin County Sheriff's HQ in Stuart, FL, she was refused service by the DEFENDANTS and was told by DEFENDANTS that her neighbors are "good Christian People".

25)     The pattern of misconduct and bias shown by DEFENDANTS has emerged clearly, wholly supported by facts and evidence.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **10** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

26)     On or about October 22, 2016, PLAINTIFF neighbor Deputy Brian Allison, County Sheriff, called DEFENDANTS on PLAINTIFF for her 'anti-Christian" behavior.

27)     In his official duties, now being promoted to Detective, Allison has been breaking arms of African-American residents while on duty as a police officer. He lied under oath repeatedly (Exh. 6)

28)     He was then sued and was a main defendant in a prominent case of police brutality in *Norrell Sutherland, et al v. Brian Allison, et al.,* No. 10-11673 (11th Cir. 2011), where the court complaint stated in pertinent part: *"Deputy Allison pulled on Sutherland's right arm behind his back, which caused Sutherland excruciating pain and lead Sutherland to "black out" for a few moments".* (Exh. 6)

29)     PLAINTIFF was informed by Martin County Sheriffs Hayslip and Faison that Deputy Allison is "a good Christian man" and that he was "concerned by PLAINTIFF's anti-Christian behavior".

30)     When later PLAINTIFF asked for the report of the incident, DEFENDANTS refused to provide it to her, telling her "It does not exist", thus engaging in spoliation of evidence and obstruction of justice.

31)     Detective Allison, on or about April 11, 2017, called DEFENDANTS on PLAINTIFF out of transphobic animus stating that PLAINTIFF is acting "anti-Christian", while installing and pointing surveillance cameras directly at PLAINTIFF's bedroom windows.

32)     PLAINTIFF requested Deputy Stacey (Badge #1702) to have her gender marker to be changed permanently to **Female** in the records as per PLAINTIFF's Florida official State ID.

33)      Deputy Stacey and Supervisor James Anthony Foster inspected the ID with the "Female" gender marker, entered it into the database and begrudgingly told PLAINTIFF that she is a "Male" and will be referred to in the report as such. Report then showed PLANTIFF being referred to as "he".

34)      The harassment from neighbors, particularly from Deputy Allison intensified and PLAINTIFF was forced to put her property for sale on June 20, 2017 but was unable to find a buyer.

35)      Around the same day, DEFENDANT SNYDER sent Deputy Jeffrey Read, who told PLAINTIFF that Deputy Allison is "a good cop", then spoke to Deputy Allison and refused to follow up with PLAINTIFF.



36)      Deputy Allison retaliated and kept threatening PLAINTIFF and calling DEFENDANTS on PLAINTIFF for no reason, such as on January 31, 2018.

37)      Deputy Allison's ex-wife Lyndsay Allison confirmed she sought order of protection against him and his propensity to violence and threats.

38)      Deputy Allison harassed PLAINTIFF with phone calls to the number he obtained from DEFENDANTs report from an identified number,

threatening her in January and particularly on February 4, 2018 and also setting his dog on her on March 18, 2018.

39)     DEFENDANTS refused to assist PLAINTIFF and cover ed up by redacting Deputy Allison's details from the reports.

40)     Detective Allison retaliated and started harassing PLAINTIFF jointly with other neighbors, DOES ONE THROUGH TWENTY.

41)     On or about February 3, 2018, PLAINTIFF was forced to call DEFENDANTS on Deputy Allison because he was drunkenly waiving and pointing his service-issued weapon on PLAINTIFF, threatening her life.

42)     DEFENDANTS ignored PLAINTIFF concerns pointing out again that Allison is a "good Christian man", who would "never hurt anybody" (Records indicate that Allison admitted in a sworn deposition that he called a black man *"f\*cking Haitian"* and told that very man *"I will teach you a lesson!"* (See the Case *No. 10-11673 (11th Cir. 2011) Docket*) (Exh. 6)

43)     PLAINTIFF repeatedly raised concerns to numerous deputies about Allison's racist, transphobic unstable behavior and violent threats towards PLAINTIFF, but was completely ignored.

44)     On October 8 and October 9, 2018, Martin County Sheriff's deputies (Mercedes Black vehicle, license plate EGU Y05) completely blocked Plaintiff's driveway, making her completely unable to get out of her home.

45)     DEFENDANTs almost drove over her cats, frightening them, the cats were running away scared, upset and traumatized by DEFENDANTs negligent and abusive actions.

46)     DEFENDANTS refused to take animal abuse reports by PLAINTIFF against them.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                      Page **13** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

47)     On or about December 18, 2018, PLAINTIFF attempted to visit female bathroom in the Gold's (now Powerhouse) gym in Stuart as a then member with her ID present.

48)     DEFENDANT Bongino, (and also a member of said gym until at least 2019), is now working as a host of various radio and TV shows, inflaming hatred towards vulnerable Americans, such as this PLAINTIFF.

49)     DEFENDANT BONGINO who was present there at the time, proceeded to call DEFENDANT SNYDER on PLAINTIFF and demanded unequivocally that SNYDER to remove PLAINTIFF from the gym and prosecute her for "damaging the rights of biological women and girls".

50)     MCSO deputies arrived almost immediately and proceeded to detain PLAINTIFF at the direction of DEFENDANT Bongino, who also claimed to be was acting under color of law in order to fulfil "Florida Law", examples of which he totally failed to show.

51)     The detention of PLAINTIFF by DEFENDANTs on December 18, 2018 and September 26, 2020 were carried out unlawfully, intentionally, and maliciously, without just or probable cause, and thus constitute a false arrest and false imprisonment.

52)     DEFENDANT BONGINO, out of transphobic animus and hatred, was also the influencer and main advisor behind the segregation policy instituted by the gym owners, based on genitalia of said gym, which had announced in April 2021 that it introduced "female-only" area that excludes "biological males" as "Exclusive Women's Only Gym", where there is "peaceful refuge from the boys".

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

53) This is the same gym, from which DEFENDANT BONGINO demanded PLAINTIFF to be removed in December 2018 simply because she is transgender woman.

54) DEFENDANT BONGINO engaged DEFENDANT SNYDER in illegal discriminatory activity towards PLAINTIFF out of hateful animus and desire to harass and punish PLAINTIFF simply for who she is.

55) DEFENDANT SNYDER favors Powerhouse Gym and its transphobic policies with his post on Facebook/social media:





COMPLAINT AND DEMAND FOR JURY TRIAL
Jeloudov v. SNYDER, Bongino, et al.

Page 15 of 42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



56)     With the most egregious incidents outlined in more detail,

additionally, from 2015 until present, various neighbors called

DEFENDANTS on PLAINTIFF only for the fact for her being trans woman

and disabled veteran.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **16** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

DEFENDANT SNYDER considers any criticism of the police as "attack on our way of life". DEFENDANT SNYDER continued to attack Portland Mayor Ted Wheeler and Louisville Mayor Greg Fischer:



57)   The neighbors complained to DEFENDANTS that PLAINTIFF offends their "family values" and "Christian beliefs", while at the same time threatening her, stalking her and using illegal surveillance against her for no legitimate reason with DEFENDANTs tacit approval and direction.

58)   On July 7, 2020, a neighbor threatened PLAINTIFF with "friends with guns".

59)   PLAINTIFF tried to call DEFENDANTS to report the threat, but to no avail.

60)      However, when the neighbors called DEFENDANTS office, the DEFENDANTS had arrived in a matter of seconds and proceeded to detain PLAINTIFF for "breach of peace".

61)      That violent and drunk neighbor then informed that he is a friend of SHERIFF SNYDER and he did some work for him and that he does not want PLAINTIFF detained anymore.

62)      DEFENDANT Sgt. Tyson and Supervisor KRYZDA failed to intervene to assist PLAINTIFF and the neighbor's wife, who complained of domestic violence and who was pushed away by that neighbor inside the house in front of the deputies.

63)      Deputies Buckley and others called that same neighbor "good family man and a devout Christian", then took the statement from PLAINTIFF with her correct gender marker (Exh. 1), but flatly refused to insert that correct female gender marker on their report *No: 2010723* filed by DEFENDANT Supervisor Kevin J. KRYZDA, while also hiding the relevant witness statements and refusing to produce them at valid, lawful and timely request.

64)      PLAINTIFF wrote her correct gender marker on her witness statement clearly and conspicuously for the DEFENDANTS to acknowledge her true gender. (Exh. 1)

65)      The gender marker was later altered by DEFENDANT KRYZDA to "Male" in their official Report No. 2012703 (Exh. 2), being approved by DEFENDANT KRYZDA. Also, PLAINTIFF reported the incident of that particular neighbor, who was harassing her. That neighbor was beating his wife (the wife told PLAINTIFF that she had domestic violence restraining order against him), but PLAINTIFF and the neighbor's wife was ignored

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

again and the same neighbor kept frivolously calling DEFENDANTS to intimidate and ostracize PLAINTIFF.

66)     On August 31, 2020, DEFENDANT SNYDER sent out the most disturbing and frightening Twitter post anyone can ever come across, which contained an overt threat and a "warning" to LGBTQ+ / "those" communities, calling himself an "Agent of Light" and "Central Truth of Moral Universe" and those "communities consigning" him, as agents of "Darkness" and signed it as himself-Wm. Snyder:



00:06                                    .ooll LTE 

<         **Tweet**

**MartinCountySheriff**
@MartinFLSheriff

That Light dispels darkness is a central truth of the moral universe. Police personnel must be the agents of light in this present darkness. Warning to those communities who would consign us to the dustbin of history, you will quickly become afraid of the dark.   Wm. Snyder

12:55 · 8/31/20 · Twitter for iPhone

**18** Retweets  **9** Quote Tweets  **97** Likes

sarah @volag213 · 8/31/20
Tweet your reply

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF, as a member of American Veterans for Equal Rights (AVER), would like to invite all DEFENDANTs to participate in Stonewall Pride Parade&Festival on **Juneteenth,** June 19, 2021 in Wilton Manors, Florida, which hundreds of Martin County LGBTQ+ residents he threatens to, are expected to attend. The theme of this year's parade: **"Out of the Darkness, Into the Light".**

Previously, on August 24, 2017, DEFENDANT SNYDER wanted to "leave families and walk into the night". This is very worrying:



67)   DEFENDANTS Martin County is a municipality that refuses to recognize transgender and LGBTQ+ community as part of the Board curriculum on October 30, 2020 (see pages 4 and 5 above), thus excluding them from full participation.

**COMPLAINT AND DEMAND FOR JURY TRIAL**
*Jeloudov v. SNYDER, Bongino, et al.*

68)     On October 31, 2020 a group of parents with children told PLAINTIFF, who was simply standing on the street that: *"Trump will be re-elected next week"*, and advised PLAINTIFF *"to go back into the closet if I were you"*. PLAINTIFF called DEFENDANTS, but they refused to assist.

69)     On March 16, 2021, PLAINTIFF neighbors kept sic'ing their dangerous dogs on PLAINTIFF. DEFENDANTs were aware of the dangerous dogs kept on that property. The dogs jumped over the fence and run towards PLAINTIFF on her property, while PLAINTIFF had to run away.

70)     PLAINTIFF called DEFENDANTS, but they ignored her request to register the previous and current hate crimes committed against her and submitting them to the Florida Attorney General and to the FBI Hate Crime Division via the established procedures and channels to maintain records of and to report such specific hate-based crimes.

71)     PLAINTIFF is in need of real protection from those who hate her simply for who and what she is, from those who threaten her based on their bigoted and hateful views.

72)     DEFENDANTS have failed to fulfil their obligations and neglected on their duties completely in that regard under the law.

73)     On March 31, 2021, on Transgender Day of Visibility, another PLAINTIFF's neighbor pointed a firearm at her, then began filming PLAINTIFF telling her that she *"deserved to die for opposing America"*.

74)     PLAINTIFF called DEFENDANTS office to complain about the incident and also about that same continuous harassment from the same neighbors, constant illegal invasion of her privacy by them illegally filming

her without her consent, because the neighbors engaged in the sport of wanting "to see her real genitals and breasts".

75)     DEFENDANTS told PLAINTIFF that they will not come over to act on her pleas for help, because "everyone knows you're an Anti-Christ-we agree with Wells Fargo!"

76)     DEFENDANTS cruelly and sadistically referred to PLAINTIFF's ex-employer, who harassed her, discriminated against her and eventually fired her in 2014 for being transgender woman and disabled veteran and who, too, accused her of "Satanism".

77)     DEFENDANTs illegally profiled her based on her LGBTQ+ and veteran status and other lawfully identifiable criteria and exacerbate already present trauma.

78)     DEFENDANTS also refused to call for an ambulance for PLAINTIFF, when she needed it.

79)     According to the National Center for Transgender Equality (NCTE) (Exh. 4), discrimination and harassment of transgender individuals such as PLAINTIFF, by the police is commonplace even in urban areas. PLAINTIFF seeks to change and hold DEFENDANT behavior accountable towards her and towards LGBTQ+ and other vulnerable communities by asking this Court to issue a declaratory relief to get the DEFENDANTS to promulgate and enforce anti-discrimination policies, which were never shown to PLAINTIFF, if they in fact, even exist.

80)     Disturbingly, DEFENDANTs approve and subscribe to Vladimir Putin's of Russia transphobic hateful rhetoric.

81)     Among other transphobic statements, such as calling trans people "transformers" in 2019, this particular incident in 2014 is relevant here.

During the press conference, Putin, when asked about trans people, turned the interview to the subject of genitalia: "If a grandma had the genitals of a grandpa, she would be a grandpa", which is essentially what is behind DEFENDANTS animus towards PLAINTIFF.

82)  Defendants' obsession with genitalia and demands of DEFENDANTS to show it to them violates the 4th Amendment of the US Constitution and its relevant Unreasonable Search Statutes. DEFENDANTS behavior towards PLAINTIFF is designed to humiliate, embarrass, harass and invade her privacy and those similarly situated.



## JURISDICTION AND VENUE

83) This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1343, 2201 and 2202.

84) This Court has personal jurisdiction over Defendants because: (a) Defendants are State Government entities operating, present, and/or doing business within this jurisdiction, and (b) Defendants' tortious conduct occurred within this jurisdiction.

85) This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

86) The United States District Court for the Southern District of Florida has jurisdiction of this action under 42 U.S.C. §1983, 28 U.S.C. §1331, and 28 U.S.C. §1343.

87) Venue of this action is proper in this Court pursuant to 28 U.S.C. § 1391, as the causes of action alleged herein arose in Martin County, Florida.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS AND CAUSES OF ACTION

*CAUSE OF ACTION # 1*- **DISCRIMINATION and FAILURE TO INTERVENE, causing DEPRIVATION of PLAINTIFFs RIGHTS, PRIVILEGES, OR IMMUNITIES SECURED BY THE CONSTITUTION OR LAWS OF THE UNITED STATES in VIOLATION OF THE FOURTH and FOURTEENTH AMENDMENT OF THE US CONSTITUTION AND VIOLATION OF EQUAL**

**PROTECTION STATUTES** *(BY PLAINTIFF AGAINST ALL DEFENDANTS)*

88) PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 - 87 above, and further alleges as though fully set forth herein.

89) The Fourteenth Amendment promises "the equal protection of the laws." *U.S. Constitution, Amendment XIV, § 1.* By this civil rights action, brought for violation of civil rights violations under *42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 and Florida Statutes 760.51 (Violation of Constitutional Rights) and Florida Civil Rights Act of 1992*, PLAINTIFF seeks to vindicate her clearly established constitutional rights.

90) PLAINTIFF seeks to hold Sheriff SNYDER, who violated them on numerous occasions, accountable to the Florida Constitution he swore to uphold. "Ever since the Supreme Court began to apply heightened scrutiny to sex-based classifications, its consistent purpose has been to eliminate discrimination on the basis of gender stereotypes." (*Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011).

91) DEFENDANTS' disparate treatment of transgender individuals by facially and intentionally discriminating against them based on sex-related considerations is in violation of established case law and numerous statutes: *Bostock v. Clayton County* (590 US 140 S. Ct. 1731; 2020 WL 3146686; 2020 US LEXIS 3252), see also *Adams v. School Board of St. Johns County,* No. 18-13592 (11th Cir. 2020)

92) PLAINTIFF complained to DEFENDANTS about neighbor harassment and violent threats since 2015 and asked to be referred in correct gender pronoun, name and form as per her officially ID.

93)      PLAINTIFF was ignored and misgendered/misnamed regardless.

94)      PLAINTIFF complained to DEFENDANTS on February 3, 2018 about transphobic and racist police officer and his harassment and threats towards PLAINTIFF. and was ignored again.

95)      Deputy Allison is a County Sheriff and is a friend of DEFENDANT SNYDER.

96)      Deputy Allison was breaking arms of black people **Derek Chauvin-style**, when arresting them during execution of his duties as a police officer.

97)      The record of Deputy Allison, when it comes to defenseless black residents is clearly jaw-dropping, yet DEFENDANTS preferred and choose to enforce the law significantly more favorably towards Deputy Allison and those cisgender DEFENDANTS and neighbors (DOES ONE THROUGH TWENTY), while sideling, ignoring and discriminating against this PLAINTIFF.

98)      Furthermore, DEFENDANTS instead covered up and protected PLAINTIFF's bigoted and hateful neighbors, who regularly harassed and threatened PLAINTIFF, only because they are "good Christians".

99)      PLAINTIFF's neighbors, motivated by vicious transphobic animus, anti-Semitic hatred and bias against disabled veterans, called DEFENDANTS to complain about her exterior cameras, which she was forced to install for her safety.

100)     DEFENDANTS ignored PLAINTIFF pleas to help and wrongfully accused her of "perversion lifestyle", being "provocatively dressed" and for promoting "sexual deviancy".

101)    PLAINTIFF attempted to report threats against her by neighbors based on her disability and gender identity on April 2, 2020. DEFENDANTS ignored her.

102)    DEFENDANT Gitlin, while acting in the course and scope of his employment with the Sheriff's Office, upon eventual arrival asked PLAINTIFF whether she is a "biological male" and promised later to write report with case *No: 20073486:*



103)    PLAINTIFF again has asked DEFENDANTS to investigate, but DEFENDANTS Records Unit stated that DEPUTY Gitlin had the hate crime report "cancelled" and there was only the 911 call note.

104)    Gitlin told PLAINTIFF that she needs to "prove she is a woman" in order for him to enter "Female" on his and any subsequent report.

105)    DEFENDANT Gitlin demanded to show him PLAINTIFF genitals in violation of unreasonable search statute.

106)    PLAINTIFF refused and was told she was in violation of law. DEFENDANT GITLIN then refused to write the report or follow up.

107)     Since then, especially when DEFENDANTS unreasonably shot and
killed a defenseless woman near PLAINTIFF's residence on January 12,
2021, PLAINTIFF is in fear of DEFENDANT GITLIN.

108)     PLAINTIFF requested on or about October 5, 2020 that the Martin
County Sheriff's Office to conduct ethics investigation of Deputy Gitlin and
was informed that there will be no investigation, while misgendering and
humiliating her again.

109)     DEFENDANT SNYDER had written just once to PLAINTIFF on
May 6, 2020 while acknowledging her previous complaints, misgendering
her and using wrong pronouns towards her time and time again by calling
her "Mr. Gregory" and failing to acknowledge her chosen name Jodi by
referring to it as "Mr. J".

110)     The letter from DEFENDANT SNYDER below promised "to assign
this matter for investigation by our Department of Law Enforcement
Director".

111)     There was no "Department of Law Enforcement" or "Director"
thereof within Martin County Sheriff's Office, neither on their publicly
available website https://www.mcsofl.org/ or anywhere, and there is no
department by that name or any derivation thereof now or before.

112)     DEFENDANT SNYDER misled and mocked PLAINTIFF, while
using loaded and deceitful language, which has caused her great upset.

113)     PLAINTIFF reiterated her concerns and asked to be treated with
dignity. There were no messages received and nothing was done to address
Plaintiff's complaints.

114)     DEFENDANTS, instead, retaliated and completely failed to correct
their tortious conduct, failed to offer PLAINTIFF any remedies to their

**COMPLAINT AND DEMAND FOR JURY TRIAL**                         Page **28** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

discriminatory and unlawful behavior or to furnish her with prescribed

citizen complaint forms or policy documents that she duly requested.

115)     Therefore, PLAINTIFF exhausted all the required administrative pre-

requisites and was left with no option but to file this action in this honorable

Court.



**William D. Snyder**
Sheriff
(772) 220-7000

**Office of the Sheriff**
Martin County, Florida
www.sheriff.martin.fl.us

May 6, 2020

Mr. J. Gregory Jeloudov

Jensen Beach, FL 34957

Dear Mr. Jeloudov:

I am in receipt of your correspondence and have assigned this matter for investigation by our Department of Law Enforcement Director. I understand that one of his staff members has left a voice mail message for you with his contact information. I anticipate his further attempts to contact you will be successful.

Sincerely,

William D. Snyder
Sheriff

WDS/cb



MAILING ADDRESS
800 SE MONTEREY ROAD
STUART, FL 34994-4907

CIVIL DEPARTMENT ADDRESS
100 EAST OCEAN BOULEVARD
STUART, FL 34994



ADMINISTRATIVE & JAIL COMPLEX
800 SE MONTEREY ROAD
STUART, FL 34994-4907

116)    PLAINTIFF neighbors kept threatening her with "friends with guns".

117)    Then, on July 7, 2020, they again frivolously and vexatiously called DEFENDANTS to harass her.

118)    On September 26, 2020, PLAINTIFF was resting in her fenced-in and completely closed from even close-up view backyard with her cats. Suddenly her next-door neighbors began gushing water from a very powerful hose across the fence on her and her cat, while with at least five people filming PLAINTIFF, laughing at her distress, while also filming children on the adjacent property (needless to say that those other residents of NE Savannah Rd were extremely upset at being filmed, but DEFENDANTS ignored those valid concerns completely, focusing more on PLAINTIFF's being a trans woman, which they viewed as "deviancy"). One of those neighbor's guests pulled a firearm, pointed it at PLAINTIFF and shouted at her: "*Hey you, fag!! November 3rd, we re-elect Trump and Sheriff SNYDER! November 4th -you're dead!*"

119)    Then those said neighbors have been terrorizing PLAINTIFF since the day they moved in in August 2020, by frivolously calling DEFENDANTS on PLAINTIFF in order to upset, harass and humiliate her.

120)    DEFENDANTS chose to support, encourage and implement transphobic, religious and ableist hatred and bigotry of those "good Christian" neighbors over PLAINTIFF, who has been law-abiding tax-payer of Martin County for almost seven years.

121)    DEFENDANT Castoro upon arrival, immediately informed PLAINTIFF that she is a "threat to chidren", "man with mental issues" and proceeded to detain her, while causing excruciating pain to her wrists. All while being filmed by those next-door neighbors and their guests, who were

laughing at PLAINTIFF and cheering on DEFENDANTS, shouting: "Lock him up!", referring to PLAINTIFF.

122)     DEFENDANTS again purposely misgendered PLAINTIFF on their reports, stemming from neighbor's vexatious calls on her in July 7th and September 26th 2020 *(Report No: 2015137),* despite being asked to enter correct "Female" gender marker as per her Florida ID, numerous times.

123)     Asking to see anyone's genitalia **Vladimir Putin-style** (see page 23) without consent and permission is the tortious and discriminatory conduct, that DEFENDANTS have engaged in constantly in the totality of the circumstances, and such conduct is so outrageous in character and so extreme in degree as to go beyond all bounds of decency-specifically, such as when DEFENDANT Gitlin demanded to inspect and "verify" PLAINTIFF genitalia to grossly invade her privacy and to gratify his own sexual sickness in April 2020 and when Deputy Buckley demanded same in order to enter "Female" on the report.

124)     PLAINTIFF refused to be "inspected" and thus "Male" was entered on the report to humiliate and to put down this PLAINTIFF.

125)     Defendant Martin County Sheriff's Office, as a further matter of policy and practice, has failed to train properly its police officers, including DEFENDANTS Castoro, Gitlin and LM Richardson, with respect to constitutional, statutory, and departmental limits of their authority, thus causing police officers, including Officer Castoro, to engage in unlawful and discriminatory conduct.

126)     PLAINTIFF reported the incidents to the *U.S. Dept of Veterans Affairs* (VA) and *Wounded Warrior Project* (WWP) Alumni Support, where she is an active participant.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **31** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

127)    Both the US Government and WWP have expressed their concerns with the DEFENDANTS outrageous behavior.

128)    Defendants' misconduct directly and proximately caused Plaintiffs to suffer injury, including emotional distress and humiliation. DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF.

WHEREFORE, Plaintiff requests judgment against defendants, and each of them, for: compensatory damages, punitive damages, costs of suit, as well as declaratory relief declaring the acts of Defendants to be unconstitutional, and such other relief as the Court may deem just and proper.

*CAUSE OF ACTION # 2*-**DISABILITY AND VETERAN STATUS HARASSMENT AND DISCRIMINATION IN VIOLATION OF FLORIDA AND FEDERAL LAW, PARTICULARLY OF AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED, ALSO OF 42 U.S.C. § 12101 ET SEQ., AND THE REHABILITATION ACT OF 1973, 29 U.S.C. § 701 ET SEQ., (2)** *(BY PLAINTIFF AGAINST ALL DEFENDANTS)*

129)    PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 - 128 above, and further alleges as though fully set forth herein:

130)    DEFENDANTS paint transgender women and disabled veterans such as PLAINTIFF as "men with mental issues" and ignores their request for help, thus violating the Equal Protection Clause of the 14th Amendment of the US Constitution.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                              Page **32** of **42**
*Jeloudov v. SNYDER, Bongino, et al.*

131)     DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF.

WHEREFORE, Plaintiff requests judgment against defendants, and each of them, for: compensatory damages, punitive damages, costs of suit, as well as declaratory relief declaring the acts of Defendants to be unconstitutional, and such other relief as the Court may deem just and proper.

## *CAUSE OF ACTION # 3*- INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS *(BY PLAINTIFF AGAINST ALL DEFENDANTS)*

132)     PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 – 131 above, and further alleges as though fully set forth herein:

133)     As a result of the actions by DEFENDANTS, PLAINTIFF suffered severe emotional distress and psychological trauma. DEFENDANTS caused to PLAINTIFF significant upset to her reputation and character.

134)     DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF.

WHEREFORE, Plaintiff requests judgment against defendants, and each of them, for: compensatory damages, punitive damages, costs of suit, as well as declaratory relief declaring the acts of Defendants to be unconstitutional, and such other relief as the Court may deem just and proper.

_CAUSE OF ACTION # 4_-**GENDER IDENTITY and SEXUAL ORIENATION HARASSMENT AND DISCRIMINATION IN VIOLATION OF FLORIDA AND FEDERAL LAW** _(BY PLAINTIFF AGAINST ALL DEFENDANTS)_

135)    PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 - 134 above, and further alleges as though fully set forth herein:

136)    DEFENDANTS paint all transgender people and PLAINTIFF in this case, as "child molesters" in the same way gay and bisexual people were witch-hunted and wrongfully accused of in the past.

137)    Defendant Martin County Sheriff's Office, as a matter of policy and practice, has failed to discipline, train, or otherwise sanction police officers who violate the rights of citizens, thus encouraging Officers Kryzda, Gitlin and Castoro to engage in the unlawful and actionable conduct described herein.

138)    DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF.

139)    It should be noted that Bee Love Slater, a black transgender woman, was murdered in September 2018 not far from Plaintiff's residence. Bee Love was misgendered, deadnamed and humiliated in exact same discriminatory manner.

140)    The pattern of DEFENDANTS tortious conduct at the center of this Complaint towards PLAINTIFF is severe, clear, convincing, repetitive and consistent. The misconduct is not isolated or even sporadic, it's overwhelmingly pervasive and thus cannot be tolerated in a civilized society.

141)     DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF.

WHEREFORE, Plaintiff requests judgment against defendants, and each of them, for: compensatory damages, punitive damages, costs of suit, as well as declaratory relief declaring the acts of Defendants to be unconstitutional, and such other relief as the Court may deem just and proper.

## *CAUSE OF ACTION # 5*-CIVIL CONSPIRACY *(BY PLAINTIFF AGAINST ALL DEFENDANTS)*

142)     PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 - 141 above, and further alleges as though fully set forth herein: DEFENDANTS conspired with one another, as well as other individuals and entities, to perpetrate an unlawful act upon Plaintiff and/or to perpetrate a lawful act by unlawful means, to wit:

143)     DEFENDANT BONGINO has engaged in civil conspiracy to deprive PLAINTIFF of her rights and freedoms.

144)     The participants in the conspiracy, including DEFENDANT BONGINO, put their own pecuniary interests ahead of the welfare and safety of victims of the conspiracy, including Plaintiff (Exh. 5)

145)     DEFENDANT BONGINO directly humiliated PLAINTIFF together with Defendant SNYDER and his deputies in December 2018.

146)    On April 15, 2021, DEFENDANT BONGINO praised transphobic laws attacking transgender children on his show and asked his followers and viewers to join him on Russia-based communication network Parler.

147)    On top of subscribing to Vladimir Putin's transphobic rhetoric outlined above on page 23, DEFENDANT Bongino uses Russia-based Parler to spew their hateful talking points, which result in ever higher rates of anti-transgender violence in the US, particularly against the trans women of color. The fact that DEFENDANT BONGINO is engaging with the Russian Government to attack vulnerable transgender community in the US, is raising national security and defense concerns.





## Florida House Passes Bill Banning Biological Men From Women's Sports

by Mike Robert Lee   Posted: April 15, 2021

Fight tech tyranny. Join Dan on Parler @dbongino.



(Photo by Mario Tama/Getty Images)

The Florida House passed a bill that prohibits biological men from participating in female sports.

148)     Furthermore, on June 5, 2021, DEFENDANT Bongino stated on live TV that he is PROUD of his transphobia by disparaging transgender right's movement and referring to transgender women as "crap" on his Fox show "UNFILTERED", when he told the millions of viewers that he wants to "cohabitate in phobic bliss".

149)     DEFENDANT BONGINO also praised transphobic Florida laws, targeting particularly vulnerable transgender children, signed by the Florida Governor Ron DeSantis on the first day of Pride Month- June 1, 2021 (whom he interviewed there and praised):



150)    Upon information and belief, Defendants -- by and through their employees and agents– had actual or constructive knowledge of the transphobic attacks on PLAINTIFF; and all Defendants were aware that their employees were playing a vital role in the success and maintenance/expansion of the transphobic discrimination and harassment of PLAINTIFF.

151)    Several of MARTIN COUNTY Sheriff Deputies, including DEFENDANT CASTORO, proudly stated that they watch and listen to DEFENDANT BONGINO's shows and told PLAINTIFF that they agree with his views, and as a result, consider PLAINTIFF as "biological male" and "threat to women and children", while citing as foundation of their discriminatory views BONGINO's various transphobic and hateful statements such as: "How long before it's illegal to be Christian in America?", etc.:



152)   As a direct and proximate result of Defendants' participation in, and furtherance of the said conspiracy, Plaintiff has suffered damages.

153)   DEFENDANTS knew, should have known, allowed or participated in the unlawful practices, which caused damages to PLAINTIFF and the whole transgender/LGBTQ+ community, which suffering severely as a result of the hatred being spread and hateful acts being instituted by the DEFENDANTS.

154)   Disturbingly, DEFENDANT SNYDER has openly engaged with Pasco County Sheriff's Office and their illegal "Intelligence-Led Policing Program" in July 2017, the program that was applied towards PLAINTIFF and for which Pasco County Sheriff was sued in the US District Court Florida Middle District on March 10, 2021 (Case: *Taylor et al. v. Chris Nocco*, Case No. 8-21-cv-00555)



155)     The DEFENDANTS will continue to engage in these violations of the Fourth Amendment and propagating hatred, thus leading to more violence, if they are not enjoined from continuing the above-mentioned violations and discriminatory behavior described in this Complaint.

156)     As a direct result of the DEFENDANTs widespread custom of systematically deploying genital enforcement as a pretextual means to coerce, intimidate and harass, PLAINTIFF has suffered an immediate and direct injury for which she is entitled to compensation.

WHEREFORE, Plaintiff requests judgment against defendants, and each of them, for: compensatory damages, punitive damages, costs of suit, as well as declaratory relief declaring the acts of Defendants to be unconstitutional, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF and DEMAND FOR JURY TRIAL

PLAINTIFF re-alleges, incorporates and adopts by reference herein, Paragraphs 1 -156 above and pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

WHEREFORE, based on the foregoing paragraphs and causes of action, PLAINTIFF respectfully requests this honorable Court to be awarded costs, expenses, pursuant to Federal Law and Florida Statutes and any other applicable laws and that the Court enters Judgment against all DEFENDANTS mentioned herein to award PLAINTIFF compensatory and punitive damages,

costs of this action, relief in the form of economic damages, compensatory and emotional distress damages, liquidated damages, interest, any and all damages authorized under the above violated laws, equitable relief, and such other and further relief as the Court deems just, equitable and proper.

## **RESERVATION OF RIGHTS**

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Dated: June 15, 2021

Respectfully submitted,

Jodi (Gregory) Jeloudov

2301 NE Savannah Rd, #1032

Jensen Beach, FL, 34957

Telephone: (772) 301 3773

Facsimile: (321) 326 9116

Plaintiff in Pro Per

1

## **VERIFICATION**

2

3

4

    I declare that I have read the foregoing Verified Complaint and that the facts
alleged are true and accurate to the best of my knowledge and belief.

5

6

7

GREGORY JODI JELOUDOV

8

9

    Sworn and subscribed before me on, _June 15_, 2021 by
_Gregory Jeloudov_, who _____ is personally known to
me _X_ produced _US Veterans ID_ as identification and who took
an oath.

10

11

12

13

14

NOTARY PUBLIC-STATE OF FLORIDA

15

Name: _Susan Slack_

Commission No. _GG-301352_

16

My Commission Expires: _March 5, 2023_

SUSAN SLACK
Notary Public - State of Florida
Commission # GG 301352
My Comm. Expires Mar 5, 2023
Bonded through National Notary Assn.

17

    DATED: _June 15_, 2021

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**                    Page **42** of **42**

*Jeloudov v. SNYDER, Bongino, et al.*

**Exhibit 1**



Exhibit 2

07/09/2020    11:28                                   (FAX)                        P.001/003

# Martin County Sheriff's Office

REPORT NUMBER
2010723

## INCIDENT REPORT

CONFIDENTIAL? ☐                    PAGE 1 OF 3

| DATE REPORTED | TIME | DAY OF WEEK | OCCUR DATE | TIME FROM | OCCUR DATE | TIME TO | LOCATION OF OCCURRENCE |
|---|---|---|---|---|---|---|---|
| 07/07/2020 | 1824 | TUESDAY | 07/07/2020 | 1822 | 07/07/2020 | 1911 | RES |

| OFFENSE 1 | CHARGE TYPE 9 | ☐ ATTEMPT | ☐ DOMESTIC VIOLENCE | CLASS | COUNTS | CITY | MCO |
|---|---|---|---|---|---|---|---|
| FS | | | | | 1 | JENSEN BEACH | |

| OFFENSE 2 | CHARGE TYPE | ☐ ATTEMPT | ☐ DOMESTIC VIOLENCE | CLASS | COUNTS | TYPE OF PREMISES OR LOCATION |
|---|---|---|---|---|---|---|
| | | | | | | 27    Residential Street |

| OFFENSE 3 | CHARGE TYPE | ☐ ATTEMPT | ☐ DOMESTIC VIOLENCE | CLASS | COUNTS | AREA | BEAT | JUVENILE | GANG | BIAS |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | N | 3 | NO | NO | 77 |

## PERSONS

| INVOLV | No | LAST OR BUSINESS NAME | FIRST | MIDDLE | D.O.B. | AGE | RACE | SEX | HGT | WGT | DL NUMBER | ST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T | 1 | JELOUDOV | GREGORY | | | | | M | | | | |

| RESIDENCE – NO. AND STREET | ☐ NONE | CITY | STATE | ZIP | EMAIL | RES PHONE |
|---|---|---|---|---|---|---|
| | | JENSEN BEACH | FL | 34957 | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE |
|---|---|---|---|---|
| | | | | |

| LANG | RELATION TO SUSPECT | ADDITIONAL INFORMATION | OCCUPATION | OTHER. PHONE |
|---|---|---|---|---|
| EN | | | | |

| INJURY TYPE | DESCRIPTION OF INJURY | INJURY CAUSED BY (WEAPON) | TREATMENT |
|---|---|---|---|
| | | | |

| INVOLV | No | LAST OR BUSINESS NAME | FIRST | MIDDLE | D.O.B. | AGE | RACE | SEX | HGT | WGT | DL NUMBER | ST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T | 1 | | | | | | | | | | | FL |

| RESIDENCE – NO. AND STREET | CITY | STATE ZIP | RES PHONE |
|---|---|---|---|
| | | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE |
|---|---|---|---|---|
| | | | | |

| LANG | RELATION TO SUSPECT | ADDITIONAL INFORMATION | OTHER. PHONE |
|---|---|---|---|
| EN | | | |

| INJURY TYPE | DESCRIPTION OF INJURY | INJURY CAUSED BY (WEAPON) | TREATMENT |
|---|---|---|---|
| | | | |

| INVOLV | No | LAST OR BUSINESS NAME | FIRST | MIDDLE | D.O.B. | AGE | RACE | SEX | HGT | WGT | DL NUMBER | ST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T | 1 | | | | | | | | | | | FL |

| RESIDENCE – NO. AND STREET | CITY | STATE ZIP | RES PHONE |
|---|---|---|---|
| | | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE |
|---|---|---|---|---|
| | | | | |

| LANG | RELATION TO SUSPECT | ADDITIONAL INFORMATION | OCCUPATION | OTHER. PHONE |
|---|---|---|---|---|
| EN | | | | |

| INJURY TYPE | DESCRIPTION OF INJURY | INJURY CAUSED BY (WEAPON) | TREATMENT |
|---|---|---|---|
| | | | |

## SUSPECTS

| INVOLV No | LAST OR BUSINESS NAME | FIRST | MIDDLE | DOB | AGE | RACE | SEX | HGT | WGT | HAIR | EYES | SSN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

| RESIDENCE – NO. AND STREET | ☐ NONE | CITY | STATE ZIP | DRIVER'S LICENSE | ST | RES PHONE: |
|---|---|---|---|---|---|---|
| | | | | | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE: |
|---|---|---|---|---|
| | | | | |

| LOCAL BOOKING NO | STATE ID | COUNTY ID | CHARGES | OCCUPATION | ☐ UNEMPLOYED | OTHER PHONE |
|---|---|---|---|---|---|---|
| | | | | | | |

| AKAS/ MONIKERS | SCARS/ MARKS/ TATTOOS | MOST SEVERE WEAPON USED |
|---|---|---|
| | | |

| INVOLV No | LAST OR BUSINESS NAME | FIRST | MIDDLE | DOB | AGE | RACE | SEX | HGT | WGT | HAIR | EYES | SSN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

| RESIDENCE – NO. AND STREET | ☐ NONE | CITY | STATE ZIP | DRIVER'S LICENSE | ST | RES PHONE: |
|---|---|---|---|---|---|---|
| | | | | | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE: |
|---|---|---|---|---|
| | | | | |

| LOCAL BOOKING NO | STATE ID | COUNTY ID | CHARGES | OCCUPATION | ☐ UNEMPLOYED | OTHER PHONE |
|---|---|---|---|---|---|---|
| | | | | | | |

| AKAS/ MONIKERS | SCARS/ MARKS/ TATTOOS | MOST SEVERE WEAPON USED |
|---|---|---|
| | | |

| INVOLV No | LAST OR BUSINESS NAME | FIRST | MIDDLE | DOB | AGE | RACE | SEX | HGT | WGT | HAIR | EYES | SSN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

| RESIDENCE – NO. AND STREET | ☐ NONE | CITY | STATE ZIP | DRIVER'S LICENSE | ST | RES PHONE: |
|---|---|---|---|---|---|---|
| | | | | | | |

| BUSINESS or SCHOOL ADDRESS | ☐ UNEMPLOYED CITY | STATE ZIP | BUSINESS or SCHOOL NAME | BUS PHONE: |
|---|---|---|---|---|
| | | | | |

| LOCAL BOOKING NO | STATE ID | COUNTY ID | CHARGES | OCCUPATION | ☐ UNEMPLOYED | OTHER PHONE |
|---|---|---|---|---|---|---|
| | | | | | | |

| AKAS/ MONIKERS | SCARS/ MARKS/ TATTOOS | MOST SEVERE WEAPON USED |
|---|---|---|
| | | |

| OFFICER 1: 2081 | OFFICER 2: | SUPERVISOR: | 07/08/2020 |
|---|---|---|---|
| BUCKLEY | | 1608 KRYZDA, KEVIN JOHN | |

**Exhibit 3**

The Martin County Sheriff's Office agrees to cooperate with any Federal investigation related to this MOA to the full extent of its available powers, including providing access to appropriate databases, personnel, individuals in custody and docwnents. Failure to do so may result in the termination of this MOA. Failure of any participating MCSO employee to cooperate in any Federal investigation related to this MOA may result in revocation of such individual's authority provided under this MOA. The Martin County Sheriff's Office agrees to cooperate with Federal personnel conducting reviews to ensure compliance with the terms of this MOA and to provide access to appropriate databases, personnel, and docwnents necessary to complete such compliance review. It is understood that information provided by any MCSO personnel under threat of disciplinary action in an administrative investigation cannot be used against that individual in subsequent criminal proceedings, consistent with *Garrity v. New Jersey*, 385 U.S. 493 (1967), and its progeny.

As the activities of participating MCSO personnel under this MOA are undertaken under Federal authority, the participating MCSO personnel will comply with Federal standards and guidelines relating to the Supreme Court's decision in *Giglio v. United States*, 405 U.S. 150 (1972), and its progeny, which govern the disclosure of potential impeachment information about possible witnesses or affiants in a criminal case or investigation.

The Martin County Sheriff's Office and ICE are each responsible for compliance with the Privacy Act of 1974, 5 U.S.C. §552a, OHS Privacy Act regulations, 6 C.F.R. §§ 5.20-5.36, as applicable, and related system of records notices with regard to data collection and use of information under this MOA.

## I. CIVIL RIGHTS STANDARDS

Participating MCSO personnel are bound by all Federal civil rights laws, regulations, and guidance relating to non-discrimination, including the U.S. Department of Justice "Guidance for Federal Law Enforcement Agencies Regarding the Use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity," dated December 2014, Executive Order 13,166, "Improving Access to Services for Persons with Limited English Proficiency," (Aug. 2000), Title VI of the Civil Rights Act of 1964, as amended, 42. U.S.C. 2000 et seq., which prohibits discrimination based upon race, color, or national origin (including limited English proficiency) in any program or activity receiving Federal financial assistance, Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination based on disability and requires the Martin County Sheriff's Office to provide effective communication to individuals with disabilities, and Title II of the Americans with Disabilities Act of 1990, which also prohibits discrimination based on disability and requires the Martin County Sheriff's Office to provide effective communication to individuals with disabilities.

## V.     REPORTING AND DOCUMENTATION

### A. COMPLAINT PROCEDURES

The complaint reporting procedure for allegations of misconduct by participating MCSO personnel, including activities undertaken under the authority of this MOA, is included in AppendixB.

### B. COMMUNICATION

The FOD in The Miami Field Office and the Martin County Sheriff's Office shall make every effort to meet at least annually to ensure compliance with the terms of this MOA. When necessary, ICE and the Martin County Sheriff's Office may limit the participation of these meetings in regard to non-law enforcement personnel. The attendees will meet in The Miami Field Office at

**Exhibit 4**

# Introduction

American policing is in grave need of reform. Reports of racial and religious profiling, killings of unarmed civilians, and sexual abuse and other forms of misconduct by police across the nation are all too common. Over half (58%) of transgender people who interacted with law enforcement who knew they were transgender in the last year reported experiences of harassment, abuse or other mistreatment by the police according to the US Transgender Survey (USTS). Transgender people often feel, accurately, that they can do nothing about this mistreatment, knowing that they risk falling victim to additional mistreatment by those tasked with conducting and overseeing the complaint process.

As we make groundbreaking advancements towards transgender equality, many members of our communities continue to be affected by disproportionate contact with, and often by bias and abuse within, policing and the criminal justice system. Transgender people face staggering levels of violence, homelessness, and poverty in the United States, with transgender people of color experiencing the greatest disparities. Thus, it is not surprising that, even though transgender people are more likely to be victims of violent crime than non-transgender people, over half (57%) of all USTS respondents feel uncomfortable calling the police for help when they need it.

Thepurpose of this report is to promote stronger and more fair policies when it comes to police interactions with transgender people. This report focuses primarily on policies specifically governing police interactions with transgender people, including non-discrimination statements, recognition of non-binary identities in applicable policies, use of respectful communication, recording information in department forms, search procedures, transportation, placement in temporary lock-up facilities, access to medication, removal of appearance related items, training, and bathroom access. For each topic, model policies are provided that can and should be adopted by police departments in collaboration with transgender leaders in their communities.

**Exhibit 5**

Case 4:21-cv-00191-MW-MAF Document 30 Filed on FLSD Docket 06/15/2021 Page 52 of 64



articles

# Florida House Passes Bill Banning Biological Men From Women's Sports

by Mike Robert Lee   Posted: April 15, 2021



Fight tech tyranny. Join Dan on Parler @dbongino.



(Photo by Mario Tama/Getty Images)

T he Florida House passed a bill that prohibits biological men from participating in female sports.

LISTEN TO LATEST PODCAST

The Bongino Brief - Apr 17, 2021    00:00 / 07:26    PLAYLIST



KEITH CATE    STACIE SCHAIBLE

From Breitbart:

> HB 1475, the Fairness in Women's Sports Act, passed in the Republican-led state House by a vote of 77-40, mostly along party lines.
>
> The bill would require admission to public school and college sports teams to be based on male/female sex, not gender identity.
>
> The *Hill* reported the legislation, if enacted, "would require that sports team eligibility be based on a student's 'biological sex,'" and explained the phrase refers to "the sex assigned at birth."

The bill comes as the issue of transgender participation in female sports was thrust into the national spotlight just days into the Biden administration, with the new president signing an executive order aimed at compelling sports leagues to allow transgender participation.



Case 4:21-cv-00248-MW-MAF Document 100-1 Filed on FLSD Docket 06/16/2021 Page 54 of 64

Predictably, Florida's bill drew praise from Republicans and ire from Democrats:

> Tuck received an ovation from her GOP colleagues when she asserted the bill is "strictly to preserve the safety, integrity, fairness, and competitiveness of women's sports."

"This is about giving women and girls an equal chance to succeed," added state Rep. Jenna Persons-Mulicka (R), a former tennis player and coach. "It's simple, it's clear. I've reviewed it."

House Democrats, however, framed the legislation as an anti-LGBTQ bill.

"I don't care how many times you tell yourself this is about women's sports and not LGBTQ rights or discrimination, because that is wrong," said Rep. Anna Eskamani (D).

Rep. Carlos Guillermo Smith (D) reportedly said at a press conference hosted by LGBTQ advocacy group Equality Florida that, due to this type of legislation, "transgender children



PLAYLIST

Case [illegible] Document [illegible] Entered on FLSD Docket 06/15/2021   Page 55 of 64

So far, Idaho, Mississippi, Tennessee, and Arkansas have passed similar laws aimed at prohibiting biological males from participating in female sports.

Don't miss The Dan Bongino Show



Previous
**Project Veritas Catches CNN Director Admitting Network Hypes COVID Fears to Drive Ratings**

Next
**CNN Loses Over Half of Audience Since Inauguration**



Case 1:21-cv-19208-XXX Document 00.00 Entered on FLSD Docket 06/16/2021 Page 56 of 64

THE DAN BONGINO SHOW

PODCASTS    DEBUNK
THIS    NEWSLETTER
REPORT      BONGINO

articles

# Arkansas Gov. Signs Bill Banning Biological Men From Women's Sports

by Matt Palumbo   Posted: March 26, 2021

   

Fight tech tyranny. Join Dan on Parler @dbongino.



This website uses cookies to provide you with the best browsing experience. Find out more about our Privacy Policy.



LISTEN TO LATEST PODCAST

The Bongino Brief - Apr 17, 2021

▶ Accept 0:00 ⏪ ⏩ 🔊 ☰ PLAYLIST

Hutchinson signed the "Fairness in Women's Sports Act" after it was passed by the State House earlier this week, KAIT. Earlier in March, Republican Mississippi Gov. Tate Reeves signed a similar bill into law, sparking nationwide controversy on the topic of whether transgender women can participate in women's sports.

The bill was met with fierce criticism when it was introduced, with critics arguing that it puts transgender Arkansas residents at risk, KAIT reported. Shortly after the bill was signed, Governor Hutchinson issued a press statement through his website defending his decision.

"This law simply says that female athletes should not have to compete in a sport against a student of the male sex when the sport is designed for women's competition," the statement read, adding that the bill will "promote and maintain" fairness in women's sports.

This website uses cookies to provide you with the best browsing experience. Find out more about our Privacy Policy.



LISTEN TO LATEST PODCAST:
The Bongino Brief - Apr 17, 2021

PLAYLIST

NEW: Gov. @AsaHutchinson has signed SB 354 into law – the Fairness in Women's Sports Act bans transgender girls and women from playing on female sports teams in Arkansas. #arnews #arpx @KATVNews pic.twitter.com/ig8IihsKxb

— Marine Glisovic KATV (@KATVMarine) March 25, 2021

This comes after South Dakota Governor Kristi Noem has come under fire for rejecting a similar bill, saying that she believed the language was too vague and needed to be reworked. It was an odd excuse, given that when the bill (HB 1217) was passed by the state's legislature earlier in the month, Noem tweeted that she was excited to sign it.

In South Dakota, we're celebrating #InternationalWomensDay by defending women's sports! I'm excited to sign this bill very soon. https://t.co/OU15HOwp2r

— Governor Kristi Noem (@govkristinoem) March 8, 2021

The real reason Noem reversed seems to be due to the NCAA threatening to

This website uses cookies to provide you with the best browsing experience. Find out more about our Privacy Policy.

patchwork is not workable."

Defending her decision during a tense appearance on Tucker Carlson's show, Noem said that she'd be building a coalition of states big enough "where the NCAA cannot possibly punish us all." It's questionable whether such a coalition would be needed, as over a dozen states have proposed similar laws. Them all being passed independently would have the same effect as a "coalition of states."

Of the NCAA, Gov. Hutchinson said "I certainly will want to listen to any concerns by others if there is any NCAA issues, I certainly would like to know about that," days before signing the bill. Either he didn't hear any concerns, or was simply unwilling to cave to pressure.

Matt Palumbo is the author of Dumb and Dumber: How Cuomo and de Blasio Ruined New York, Debunk This: Shattering Liberal Lies, and Spygate

---

Don't miss The Dan Bongino Show

This website uses cookies to provide you with the best browsing experience. Find out more about our Privacy Policy.

**Exhibit 6**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. 10-11673-C
## D.C. CASE NO. 09-CV-80872-JIC

NORREL SUTHERLAND, et al,

      Appellant—Plaintiff,

vs.

BRIAN ALLISON, et al,

      Appellee-Defendant.

_____/

## REPLY BRIEF OF APPELLANT,
## NORREL SUTHERLAND

DANIEL S. WEINGER
Florida Bar No. 172900
dweinger@conradscherer.com
GREGORY R. BARTHELETTE
Fla. Bar No.: 791296
gbarthelette@conradscherer.com
CONRAD & SCHERER, LLP
Attorneys for Appellant
633 South Federal Highway
Fort Lauderdale, Florida 33301
Telephone:   (954) 462-5500
Facsimile:   (954) 463-9244

beginning of a handcuffing process that lasted for several minutes.  (R. 23-1, p. 42, line 25, p. 43, lines 1-2; , p. 45, lines 1-8.)  Moreover, this ignores Allison's own admission that the handcuffing lasted for a full minute.  (R. 22-3, p. 51, lines 15-18.)

Another instance of Defendants improperly characterizing the evidence in their own favor is their claim that Sutherland was subjected to a routine arrest. (A.B. pp. 11-12.)  This completely disregards Sutherland's testimony that despite his continued pleas for mercy, Officer Allison kept getting angrier and angrier until he unleashed a profanity laced tirade, which culminated in calling Sutherland a "f—king Haitian" and telling Sutherland that he was going to "teach [him] a lesson." (R. 23-1, p. 45, lines 1-8.)  This testimony alone creates an issue of fact as to whether Defendants use of force was objectively reasonable.  *See Brown v. City of Hialeah*, 30 F.3d 1433, 1436 (11th Cir. 1994) (finding that racial epithets and profanities that are yelled by an officer during an arrest can be considered in assessing the objective reasonableness of the officer's force).  *See also Bozeman v. Orum*, 422 F.3d 1265, 1272 n. 11 (11th Cir. 2005) (same); *Evans v. Stephens*, 407 F.3d 1272, 1281-82 (11th Cir. 2005) (recognizing that threatening and racist language "has an impact on people and counts towards the unreasonableness of the manner" in which the officer performs his duties).  If Sutherland's testimony is true, as it must be in opposition to summary judgment, it describes an arrest that is

anything but routine.  At the very least, Sutherland's testimony creates an issue of fact as to whether Defendants' use of force was objectively reasonable.

Defendants reliance on *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), is misplaced and generally highlights Defendants' failure to view the record evidence in a light most favorable to Sutherland.  The *Draper* court held that the single use of a taser gun causing a one-time shocking and resulting in no serious injury was reasonable in light of video evidence that prior to being tasered, the arrestee "was belligerent, gestured animatedly, continuously paced, appeared very excited, and spoke loudly" even after repeated and calmly stated warnings from the arresting officer that he would be taken to jail if his aggressive behavior continued. *Id.* at 1273, 78.  Conversely, in the instant case, the record evidence does not show a short and quick handcuffing by a calm and collected officer.   Rather, the evidence viewed in a light most favorable to Sutherland shows a decidedly long and drawn out handcuffing process that began with Allison making a racial epithet before persistently yanking and pulling on Sutherland's deformed arm, all while unleashing a profanity laced tirade.  Moreover, unlike the plaintiff in *Draper*, Sutherland *did* suffer permanent injuries as, in addition to suffering a broken arm, Sutherland also sustained further nerve damage from the incident: he no longer has any movement in his pinky finger and his passive range of motion in his right arm

has been reduced by half as compared to his passive range of motion prior to the incident. (R. 27-1, pp. 14-15, ¶ 6)

Finally, Defendants ignore the inconsistencies between the internal investigation and the testimony in this case, including Allison and Perez changing their version of events, as discussed in great detail in the fact section of the Initial Brief. (I.B. pp. 10-12.) These inconsistencies alone create a reasonable inference that Allison and Perez initially lied about the events in order to cover up their misconduct. *See Tatum v. Jackson*, 2009 WL 3633975 (S.D.N.Y.) (*citing Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 147 (2000) (finding that a "jury could reasonably have inferred that [the defendant] was deliberately lying about the events of the morning in order to cover up her misconduct. Such an inference would have been consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt."). It is so well established as to be beyond dispute that, "if [a] jury were satisfied, from the evidence, that false statements in the case were made by defendant, <u>or on his behalf, at his instigation</u>, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as